UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| TIM GOMES, et al., <br><br>              Plaintiffs, <br><br>     v. <br><br> SANTA CLARA COUNTY, et al., <br><br>              Defendants. | Case No.  5:18-cv-04191-EJD <br><br> **ORDER GRANTING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT; DENYING PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT** <br><br> Re: Dkt. Nos. 56, 63 |

In this action, Plaintiffs Tim and Catherine Gomes argue that their constitutional rights were violated when Santa Clara County social workers removed their two children (I.G. and H.G.) and placed them in county custody following allegations of neglect and abuse.  Defendants Santa Clara County, Roshanda Burns, Linda Hsaio, Michael Shaheed, Sarah Arana, and Bob Beck now move for summary judgment in their favor.  Plaintiffs also move for partial summary judgment in their favor.  Having considered the Parties' papers, the Court **GRANTS in part** Defendants' motion for summary judgment and **DENIES** Plaintiffs' motion for partial summary judgment.[1]

I.    BACKGROUND

     A.  Factual Background

Plaintiffs bring 15 claims against Defendants—Roshanda Burns, Linda Hsaio, Michael Shaheed, Sarah Arana, and Bob Beck.  The first four claims relate to the removal of Plaintiffs'

---

[1] Pursuant to N.D. Cal. Civ. L.R. 7-1(b) and General Order 72-5, this Court found this motion suitable for consideration without oral argument.  *See* Dkt. 73.

United States District Court
Northern District of California

1    older child I.G.  *See* First Amended Complaint for Damages ("FAC") ¶¶ 52–66, Dkt. 16.  Claims

2    five through nine relate to the removal of Plaintiffs' younger child H.G.  *Id.* ¶¶ 67–87.  Claim

3    thirteen relates to both children.  *See id.* ¶¶ 116–22.  In claims ten through twelve, Plaintiffs allege

4    sexual battery, sexual harassment, and sexual discrimination against Defendant Shaheed.  *Id.*

5    ¶¶ 88–115.  Claim fourteen alleges a *Monell* claim.  *Id.* ¶¶ 123–24.  Lastly, claim fifteen alleges an

6    intentional infliction of emotional distress against Defendant Arana.  *Id.* ¶¶ 125–31.  Plaintiffs

7    maintain that the social workers violated their Fourteenth Amendment right to familial association

8    and their right to be free from the use of deception and false evidence in judicial proceedings.[2]  *Id.*

9    ¶¶ 56–87, 116–31.  Plaintiffs further maintain that the social workers' conduct was negligent

10   and/or malicious.  *Id.*

### 1.  Removal of I.G.

12          In February 2013, Plaintiffs were arguing in the street about a quarter of a mile away from

13   their home.  When police officers learned that they had left 16-month-old I.G. alone at home, they

14   went to Plaintiffs' home and found I.G. near a heater and hazardous materials.  In June 2013, I.G.

15   was declared a dependent of the juvenile court and returned to Plaintiffs with family maintenance

16   services.  In February 2014, after Plaintiffs completed their case plan, the juvenile court dismissed

17   the case.  *See In re H.G.*, 2019 WL 1615301, at *1 (Cal. Ct. App. Apr. 16, 2019).

18          In January 2016, the Santa Clara County Department of Family and Children's Services

19   ("DFCS") again alleged that Plaintiffs were neglecting I.G based on the fact that police had

20   discovered rotting food and human waste through the home.  These conditions were allegedly

21   hazardous to I.G.'s health and safety.

22   _____

23   [2] The FAC also alleges that the warrantless seizure of H.G. violated Plaintiffs' Fourth Amendment
     rights.  FAC ¶¶ 71–75.  This is an improper claim—Plaintiffs cannot bring a Fourth Amendment

24   claim for unlawful seizure of their child—their claims are properly analyzed under the Fourteenth
     Amendment.  *Wallis v. Spencer*, 202 F.3d 1126, 1146 n.8 (9th Cir. 2000) ("The claims of the

25   parents in this regard should properly be assessed under the Fourteenth Amendment standard for
     interference with the right to family association.  Because only the children were subjected to a

26   seizure, their claims should be assessed under the Fourth Amendment." (citations omitted)).  On
     this ground, Count Six, Plaintiffs' Fourth Amendment claim, is dismissed.  Plaintiffs have

27   acknowledged this.  *See* Cormier Decl. ¶ 3, Ex. A, Interrogatory Response No. 4.

28   ORDER GRANTING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT;
     DENYING PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT

United States District Court
Northern District of California

United States District Court
Northern District of California

1   A month later, on February 29, 2016, DFCS received a referral after four-year-old I.G. was

2   found wandering alone in the street.  When Catherine was contacted, she did not know that I.G.

3   was missing and refused to claim her.  The home was again found to be dirty with unsafe

4   surroundings.  *Id.* at *2.

5   In March 2016, DFCS filed a petition alleging that I.G. "came within" the provisions of

6   California Welfare and Institutions Code § 300(b).  In June 2016, that petition was amended to

7   allege that I.G. was at risk of harm in Plaintiffs' care due to Catherine's mental health issues,

8   exposure to Plaintiffs' domestic violence, and Tim's failure to protect I.G.  *See In re I.G. ("In re*

9   *I.G. I")*, 2018 WL 5095117, at *1 (Cal. Ct. App. Oct. 19, 2018).  As support, the amended petition

10   alleged that: (1) Catherine's mental health issues were poorly managed and that she was placed on

11   a psychiatric hold in January 2016; (2) during a mental-health episode on February 2, 2016,

12   Catherine hit Tim on the back of the head; (3) when the police arrived following the domestic

13   violence incident, they found a large amount of food on the bed sheets, trash and food scattered

14   about the living room, and the odor of decomposing trash in all the rooms; (4) on February 29,

15   2016, I.G. was found wandering in the street unsupervised; (5) when the police took I.G. home,

16   Catherine stated that she did not know the child had been missing and would not claim her; and

17   (6) the police reported a foul smell emitting from the bedrooms and uncleaned cat litter and cat

18   feces.  *Id.*  The amended petition also included information about how I.G. was placed in

19   protective custody in February 2013 and was declared a dependent of the court.  In June 2016,

20   based on this amended petition, the juvenile court again declared I.G. a dependent of the court.  *Id.*

21   at *2.

22   Plaintiffs appealed this decision and argued that there was insufficient evidence to sustain

23   the allegations in the amended petition.  *See id.*  The appellate court disagreed.  *Id.* at *15.  The

24   court noted Plaintiffs' inability to care for I.G., Plaintiffs' unsanitary living conditions, I.G.'s

25   speech and social delays, and the fact that I.G. was often left alone with Catherine, who was

26   unable to care for her.  From this, the appellate court held that there was substantial evidence to

27   

28   Case No.: 5:18-cv-04191-EJD
ORDER GRANTING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT;
DENYING PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT

1  support the juvenile court's findings. *Id.*

2        Defendant Burns became the primary social worker on I.G.'s case in June 2016.  Over the

3  next year, Defendant Burns attempted to provide services to Plaintiffs.  Defendant Burns referred

4  Plaintiffs to mental health services, parent education classes, and intensive in-home services.

5  Defendant Burns also met, in person, with Plaintiffs at least once per month.  Defendant Burns

6  maintains that while the parents made some effort, they were extremely resistant to court-ordered

7  services and often did not follow through with the services offered and did not complete any case

8  plan activities.  *See* Dkt. 54-15.

9        In May 2017—following the March 2016 dependency determination—Catherine was

10  placed on an involuntary 72-hour psychiatric hold pursuant to California Welfare and Institutions

11  Code § 5150.  The hold was expanded to a 14-day hold under § 5250.  *Id.* at 15041.  Tim informed

12  Defendant Burns of the hold.  One of the treating psychiatrists told Defendant Burns that she

13  "would not leave a child with [Catherine]."  *Id.*

14        On June 9, 2017, the day Catherine was expected to be released from the hold, DFCS

15  obtained a warrant to remove I.G. from Plaintiffs' custody.  Defendant Burns signed the

16  declaration in support of the warrant and cited, among other things, Catherine's ongoing mental

17  illness and specific examples of Catherine's concerning actions, such as coming to the door naked,

18  telling a social worker that someone was trying to chop her head off, and making threats to staff

19  during her psychiatric hold.  Declaration of Rashonda Burns ("Burns Decl."), Dkt. 54-9.

20  Defendant Burns also cited Tim's poor insight and minimization of Catherine's mental health

21  issues and their impact on I.G.  *Id.*  The declaration further stated that the previous disposition in

22  2013 had not been effective in protecting I.G. because of Catherine's severe and untreated mental

23  health issues and Plaintiffs' failure to comply with their case plan services.  Based on this

24  information, the juvenile court issued a protective custody order and I.G. was placed in a foster

25  home.

26

27

United States District Court
Northern District of California

1

2

3

4

5

6

7

8

9

10

11

In August 2017, the juvenile court held a contested jurisdiction/disposition hearing on the dependency petition.  At that time, I.G. experienced anxiety, exhibited bizarre behavior, was not toilet-trained (at age five), and had a speech delay.  The juvenile court found DFCS's allegations to be true despite Plaintiffs' argument to the contrary. During an October 2017 interim review hearing, the juvenile court ordered all previous orders to remain in effect.  Plaintiffs' appealed the juvenile court's orders and argued that there was no evidence to supporting the juvenile court's orders regarding I.G.'s out-of-home placement.  *See In re I.G. ("I.G. II")*, 2018 WL 6696489, at *3 (Cal. Ct. App. Dec. 20, 2018).  The appellate court reaffirmed that there was substantial evidence to support the juvenile court's findings that the allegations in the June 2016 amended petition were true and that there was sufficient evidence to support the juvenile court's later rulings regarding I.G.  *Id.*

12

13

14

15

16

A February 22, 2019, section 366.26 report recommended that parental rights for I.G. be terminated so that I.G. could be adopted by her maternal aunt and uncle.  Following a hearing, the juvenile court found by clear and convincing evidence that I.G. was adoptable and terminated Plaintiffs' parental rights.  The appellate court upheld the juvenile court's finding.  *See In re I.G. ("I.G. III")*, 2020 WL 500176 (Cal. Ct. App. Jan. 30, 2020).

17

**2.  Removal of H.G.**

18

19

20

21

22

On November 7, 2017, Michael Shaheed replaced Defendant Burns and became the new Continuing Social Worker for the Gomes family.  A Continuing Social Worker is assigned to a case after the jurisdiction and disposition hearings and after a child has officially become a dependent of the court.  *See* Declaration of Michael Shaheed ("Shaheed Decl."), Dkt. 56-9.  At this point, Catherine was pregnant with H.G.  *Id.*

23

24

25

26

On November 22, 2017, Plaintiffs called Defendant Shaheed to let him know that Catherine was at a Kaiser hospital in San Francisco and that she expected to be in labor soon. H.G. was born two days later, on November 24, 2017.  That afternoon, the County of Santa Clara's Child Abuse and Neglect Center ("CANC") sent an email to Defendant Shaheed with a

27

28

United States District Court
Northern District of California

1    "non-report"[3] notifying Defendant Shaheed that Catherine had given birth.  The reporting party

2    learned that I.G. was not in Plaintiffs' custody and called CANC to follow hospital policies.  The

3    call was not based on any concerns about the infant.

4         However, on November 27, 2017, Defendant Shaheed received a call from a Kaiser staff

5    member expressing concern over Plaintiffs' ability to care for H.G.  Because DFCS had an open

6    case for I.G. (H.G.'s sibling), Defendant Shaheed provided the staff member with the CANC's

7    number.  Defendant Shaheed also relayed the staff members concerns to the CANC manager by

8    phone and email.  Shaheed Decl. ¶¶ 14–15.

9         Kaiser personal called the CANC and expressed concerns about Plaintiffs' lack of attention

10   toward H.G.  *See* Declaration of Bob Beck ("Beck Decl."), Dkt. 56-3; *see also* Dkt. 54-5 (report

11   with Defendant Beck's findings).  By early afternoon on November 27, the Emergency Response

12   Unit ("ER") assigned social worker Katherine DiPaulo to the case.  Beck Decl. ¶ 5.  DiPaulo

13   spoke to multiple Kaiser personnel, including a medical social worker, nurse, and doctor.  She also

14   interviewed Plaintiffs and observed Plaintiffs' interactions with the infant.  DiPaulo also observed

15   coaching attempts by Kaiser staff to Plaintiffs.  *Id.* ¶¶ 5–6.  Concerns raised by Kaiser staff

16   included letting H.G. cry for an extended time while Plaintiffs slept, leaving H.G. unswaddled to

17   the point that her body temperature dropped, not changing diapers or feeding when needed,

18   throwing dirty diapers and other trash, like Catherine's bloody post-natal pads, on the floor rather

19   than in the trash receptacles, and Tim holding H.G. by her neck and dangling her body.  *Id.* ¶ 6.

20        Based on these concerns and on DiPaulo's own observations, the ER team began the

21   process of obtaining a warrant for the removal of H.G.  *Id.* ¶ 7.  Defendant Beck and DiPaulo

22   discussed the case with their manager and decided that they would recommend removal of H.G. at

23   the Joint Case Staffing meeting that was scheduled for the next morning.  *Id.* ¶ 8.  Defendant Beck

24   and DiPaulo began work on the forms that they anticipated they would need if the Staffing

25   ───────────────

26   [3] A "non-report" occurs when the CANC receives a referral or call, but determines that the information does not rise to a level requiring a response or that the information was previously

27   reported and/or is already being addressed by the DFCS.  Shaheed Decl. ¶ 13.
     Case No.: 5:18-cv-04191-EJD

28   ORDER GRANTING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT;
     DENYING PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT

United States District Court
Northern District of California

1   meeting resulted in a decision to seek a warrant.  *Id.* ¶ 9; *see also* Dkt. 54-11 (email chain with

2   warrant attachments).

3          On the morning of November 28, the CANC received a call from Kaiser with similar

4   concerns to those expressed the previous day.  *See* Dkt. 54-5 at 4472.  The Staffing meeting took

5   place, with Defendants Beck and Shaheed, DiPaulo, and an attorney from county counsel in

6   attendance.  Defendants decided to seek a warrant for H.G.'s removal.  Beck Decl. ¶¶ 10–11.

7   DiPaulo and Defendant Beck continued to work on the warrant documents.  They believed that

8   they would have enough time to obtain a productive custody warrant before H.G. was discharged.

9   *Id.* ¶ 11.  However, on November 28, Kaiser staff informed Defendant Beck that H.G. and

10  Plaintiffs would be released "momentarily."  *Id.* ¶¶ 11.  Defendant Beck estimated that he would

11  need at least a few more hours to obtain a warrant.  *Id.*  Because of the concerns raised by the

12  Kaiser staff, Defendant Beck believed that H.G. would be in immediate risk if she was in

13  Plaintiffs' sole care.  Accordingly, rather than proceed with the warrant process, the ER team

14  decided that exigent circumstances justified emergency removal.  *Id.* ¶¶ 11–12; Dkt. 54-5 at 4474–

15  75.  DiPaulo arrived at the hospital that afternoon to take custody of H.G.  *Id.* ¶ 14.

16         Over the next two days, social workers spoke to Plaintiffs multiple times, gave them notice

17  of the upcoming December 1, 2017 court hearing, and tried to arrange separate visits for Plaintiffs

18  with H.G.  Tim declined to attend the hearing and refused to attend the separate visits.  *See*

19  Declaration of Marisela Dueñas ("Dueñas Decl.") ¶¶ 6–8, Dkt. 56.

20         On or about December 1, 2017, the County submitted an Initial Hearing Report, which the

21  juvenile court admitted as evidence.  *See* Dkt. 54-7.  During the December 1 hearing, the juvenile

22  court judge stated that he believed there was sufficient evidence to remove H.G.  *See* Dkt. 54-6 at

23  9.  The judge authorized "the Department to set up the visits in a way that they believe allows

24  them to do the assessment they need to do," even if that means separate visits.  *Id.* at 9.  The judge

25  then stated:

26

27

United States District Court
Northern District of California

1

2

3

> The Court finds [that] a prima facie case has been made that [H.G.]
> is described by section 300 of the Juvenile Court law.  Her initial
> detention was justified given the serious concerns about how the
> parents behaved with [H.G.] while at the hospital, in addition to the
> concerns about why [I.G.] was brought into and continues to be in
> our system.

4

5

*Id.* at 10.  The judge also adopted the findings and orders proposed by DFCS in its Initial Hearing

6

Report.  *Id.*

7

Ultimately, a section 366.26 report recommended that parental rights for H.G. be

8

terminated so that she could be adopted by her maternal aunt and uncle.  Following a hearing, the

9

juvenile court found by clear and convincing evidence that H.G. was adoptable and terminated

10

Plaintiffs' parental rights.  The appellate court upheld the juvenile court's finding.  *See I.G. III*,

11

2020 WL 500176.

### 3. Sexual Misconduct Claims

12

Plaintiffs next allege that on January 6, 2018, Defendant Shaheed sexually assaulted

13

Catherine during a party celebrating H.G.'s baptism.  FAC ¶¶ 41–42.  Plaintiffs allege that

14

Defendant Shaheed approached Catherine while she was holding H.G. and began touching her

15

"under the ruse of adjusting a blanket on the baby."  *Id.* ¶ 43.  Defendant Shaheed "began rubbing

16

[Catherine's] legs in a sexual manner, with his full palms on her thighs."  *Id.* ¶ 44.  She then

17

screamed and called out for Tim. *Id.* ¶ 45.  Tim claims that Catherine screamed so loudly that

18

anyone in the room would have heard.  *See* Declaration of Claire Cormier ("Cormier Decl."), Ex.

19

E at 120–35, 150–53, 154–55.  Plaintiffs reported the incident to DFCS and Defendant Shaheed

20

was removed as Plaintiffs' social worker.  An investigation was conducted.

21

Defendant Shaheed admits that he put a blanket over H.G. while Catherine was holding

22

her.  He denies that he touched Catherine's legs.  Shaheed Decl. ¶ 27; *see also id.*, Ex. F.

23

Following an investigation, the County found the claims to be unsubstantiated.  The

24

investigator, Tere Cohn-Hayes, based this conclusion on Catherine and Tim's inconsistent stories.

25

For example, Catherine told Hayes that in addition to screaming Tim's name, she also yelled, "He

26

has his hands on me!"  She also claimed that Defendant Shaheed kept his hands on her legs until

27

28

Case No.: 5:18-cv-04191-EJD
ORDER GRANTING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT;
DENYING PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT

United States District Court
Northern District of California

1    Tim came in and removed them.  Tim's story was different.  He did not report Catherine yelling,

2    "He has his hands on me!" or that he had to remove Defendant Shaheed's hands.  Rather, Tim

3    maintained that Defendant Shaheed removed his hands after Catherine yelled.  *See* Declaration of

4    Tere Cohn-Hayes ("Hayes Decl.") ¶¶ 5–6, Dkt. 56.

5         Catherine's parents contradict Plaintiffs' allegations.  Catherine's parents, the Stephanovs,

6    were in the room at the time of the alleged assault.  Cormier Decl., Exs. C & D, Response Nos. 13

7    & 14.  Both Stephanovs noted that Defendant Shaheed told Catherine and Tim that they needed to

8    keep H.G. warm and covered and that he tried to cover H.G. up when Plaintiffs failed to do so.

9    Declaration of Alexander Stepanov ("A. Stepanov Decl.") ¶ 12, Dkt. 56; Declaration of Helen

10   Stepanov ("H. Stepanov Decl.") ¶ 12, Dkt. 56.  Both stated that, based on (1) the size and

11   openness of the room where the touching allegedly occurred; (2) their presence in the room; (3)

12   Defendant Shaheed's professional demeanor; (4) the fact that neither of them saw any touching

13   nor heard Catherine call out in distress; (5) the fact that Plaintiffs did not say anything to them

14   about inappropriate touching until weeks after the reception; and (6) Catherine's mental health

15   history, they do not believe that Defendant Shaheed inappropriately touched Catherine.  A.

16   Stepanov Decl. ¶ 20; H. Stepanov Decl. ¶ 20.

17        **B.  Procedural History**

18        On June 5, 2020, Defendants filed a motion for summary judgment.  Motion for Summary

19   Judgment ("D MSJ"), Dkt. 56.[4]  Plaintiffs filed their motion for partial summary judgment and an

20   opposition brief on June 23, 2020.  Motion for Partial Summary Judgment and Opposition ("P

21

22   [4] Defendants also filed a request for judicial notice.  *See* Defendants' Request for Judicial Notice
     ("RJN"), Dkt. 57.  They ask the Court to take notice of California Court of Appeal decisions
23   (specifically, those involving I.G. and H.G.), excerpts of juvenile dependency court transcripts, the
     content of documents filed with the Santa Clara County Juvenile Court, and of the DFCS' Online
24   Policies & Procedures.  This court may take judicial notice of "proceedings in other courts, both
     within and without the federal judicial system, if those proceedings have a direct relation to
25   matters at issue."  *U.S. ex rel. Robinson Rancheria Citizens Council v. Borneo, Inc.*, 971 F. 2d
     244, 248 (9th Cir. 1992).  The Court may also take notice of official information posted on
26   government websites.  *Daniels-Hall v. Nat'l Educ. Ass'n*, 629 F.3d 992, 998–99 (9th Cir. 2010).
     For these reasons, Defendants' exhibits are subject to judicial notice and Defendants' request for
27   judicial notice is **GRANTED.**
     Case No.: 5:18-cv-04191-EJD
28   ORDER GRANTING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT;
     DENYING PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT

United States District Court
Northern District of California

1    MSJ/Opp."), Dkt. 63.  On July 8, 2020, Defendants filed their opposition to Plaintiffs' motion for

2    partial summary judgment.  Opposition/Response re Motion for Summary Judgment ("D Opp."),

3    Dkt. 66.  On July 16, 2020, Plaintiffs filed their reply to Defendants' opposition.  Reply re Motion

4    for Partial Summary Judgment ("P Reply"), Dkt. 72.

5        **II.    LEGAL STANDARD**

6            A court must grant summary judgment if the movant shows "that there is no genuine

7    dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R.

8    Civ. P. 56(a).  In order to satisfy this burden, "the moving party must either produce evidence

9    negating an essential element of the nonmoving party's claim or defense or show that the

10   nonmoving party does not have enough evidence of an essential element to carry its ultimate

11   burden of persuasion at trial."  *Nissan Fire & Marine Ins. Co., Ltd. v. Fritz Cos., Inc.*, 210 F.3d

12   1099, 1102 (9th Cir. 2000).  "In order to carry its ultimate burden of persuasion on the motion, the

13   moving party must persuade the court that there is no genuine issue of material fact."  *Id.*

14           If the moving party meets its burden of production, the nonmoving party must produce

15   evidence to support its claim or defense.  *Id.* at 1103.  If the nonmoving party fails to produce

16   enough evidence to create a genuine issue of material fact, Rule 56(c) mandates that the moving

17   party win the motion for summary judgment.  *See id.*

18       **III.   DISCUSSION**

19           **A.  Application of *Rooker Feldman* to Plaintiffs' Claims**

20           Defendants first argue that the *Rooker-Feldman* doctrine bars Plaintiffs' Section 1983

21   claims and their related state-law claims.  The Court agrees that the doctrine bars Plaintiffs'

22   Section 1983 claims as to I.G..  The Court, however, finds that the doctrine does not apply to the

23   Section 1983 claims involving H.G.

24           The *Rooker-Feldman* doctrine is a well-established jurisdictional rule prohibiting federal

25   courts from exercising appellate review over final state-court judgments.  For instance, a plaintiff

26   may not argue in federal court that a state court wrongly decided an issue.  Likewise, the doctrine

27

28

United States District Court
Northern District of California

1 "prohibits a federal district court from exercising subject matter jurisdiction over a suit that is a de

2 facto appeal from a state court judgment." *Reusser v. Wachovia Bank*, 525 F.3d 855, 858–89 (9th

3 Cir. 2008). A "de facto appeal" occurs where "claims raised in the federal court action are

4 'inextricably intertwined' with the state court's decision such that the adjudication of the federal

5 claims would undercut the state ruling or require the district court to interpret the application of

6 state laws or procedural rules." *Id.* at 859. "The *Rooker-Feldman* doctrine, generally speaking,

7 bars a plaintiff from bringing a § 1983 suit to remedy an injury inflicted by the state court's

8 decision." *Loumena v. Kennedy*, 2015 WL 906070, at *5 (N.D. Cal. Feb. 27, 2015). The doctrine

9 may even apply when the merits of a state court decision are not directly contested. The relevant

10 inquiry is whether a plaintiff's claim would "require review of the relevant state-court decisions."

11 *Grimes v. Alameda Cty. Soc. Servs.*, 2011 WL 4948879, at *3 (N.D. Cal. Oct. 18, 2011).

12   Plaintiffs' first and second claims relate to I.G.'s removal. While Plaintiffs admit that the

13 California Court of Appeal has consistently upheld I.G.'s removal and continued detention,

14 Plaintiffs argue that the courts never "adjudicated whether the facts presented by [Defendant]

15 Burns in order to obtain a warrant to remove I.G. were fraudulent facts (evidence)." Cormier

16 Decl., Exs. C & D, Interrogatory Response Nos. 1–6. Plaintiffs ground their I.G. Section 1983

17 claim in Defendant Burn's warrant application, and argue that Defendants Hsaio and Burns'

18 falsification of evidence in the warrant application caused Plaintiffs to be unconstitutionally

19 deprived of I.G. The Court must decide if the state courts have already assessed this question.

20   There are multiple instances in the records where Plaintiffs argued that Defendant Burns

21 lied in her report. For instance, during a juvenile dependency hearing Plaintiffs argued that

22 Defendant Burns' testimony and documents included statements that were "not true." *See* Dkt.

23 54-3 at 4995 ("Tim: I would like to point out that there are certain facts in the report, the social

24 study, that are just in error or not true."); *see also* Dkt. 54-8 at 921 (Tim objected to

25 characterization of Defendant Burns' report); *Id.* at 929–30. The judge in the juvenile dependency

26 hearing disagreed with Plaintiffs' argument that the report was fraudulent and found, after

27

28

1   listening to the testimony and reading the reports, that just cause existed to keep I.G. out of

2   Plaintiffs' homes.  This Court may not disrupt that finding.  Allowing Plaintiffs to pursue their

3   Section 1983 claims as to I.G. would do just that.  It would require the Court to assess whether

4   Defendant Burns' warrant included fraudulent statements.  This question has already been

5   considered and rejected by the juvenile dependency court.  For that reason, the Court **GRANTS**

6   Defendants' motion for summary judgment as to Plaintiffs' first and second counts.

7          Defendants further argue *Rooker-Feldman* bars Plaintiffs' claims as to H.G.  The Court

8   cannot agree.  Plaintiffs argue that their Fourteenth Amendment rights were violated by the

9   warrantless removal of H.G.  Pursuant to section 315 of the Welfare and Institutions Code, which

10  supported H.G.'s emergency removal, the juvenile court must determine whether the minor should

11  be *further* detained.  While the juvenile court must specify why the initial removal was necessary,

12  there is no requirement that the court find that exigent circumstances existed to justify a

13  warrantless removal.  *See Anderson-Francois v. Cty. of Sonoma*, 2009 WL 1458240, at *5 (N.D.

14  Cal. May 22, 2009); *see also Mabe v. San Bernardino Cty.*, 237 F.3d 1101, 1110 (9th Cir. 2001)

15  ("The juvenile court's findings are not relevant to whether a sufficient exigency existed at the time

16  of the removal to justify the warrantless action . . . .").  In contrast, in the Ninth Circuit, a court

17  must ask whether, at the time of the seizure, defendants had "reasonable cause to believe that the

18  child [was] in imminent danger of serious bodily injury."  Hence, this Court's inquiry into

19  exigency will not disrupt the state court's determination that further removal of H.G. was proper.

20  For that reason, the *Rooker-Feldman* doctrine does not bar Plaintiffs' H.G. claims.

21                   **B.  Fourteenth Amendment Claims/Immunity**

22          Plaintiffs argue that their Fourteenth Amendment rights were violated by the warrantless

23  removal of H.G. and that they are entitled to summary judgment on these claims.  The Court

24  disagrees.  Plaintiffs have not presented *any* evidence to show that exigent circumstances did not

25  justify H.G.'s removal.

26

27

28

United States District Court
Northern District of California

United States District Court
Northern District of California

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Parents and children have a well-established constitutional right to live together without governmental interference.  The Fourteenth Amendment guarantees that parents will not be separated from their children without due process of law except in emergencies.  Officials violate this right if they remove a child absent "information at the time of the seizure that establishes 'reasonable cause to believe that the child is in imminent danger of serious bodily injury and that the scope of the intrusion is reasonably necessary to avert that specific injury.'"  *Rogers v. Cty. of San Joaquin*, 487 F.3d 1288, 1294 (9th Cir. 2007).  "Serious allegations of abuse that have been investigated and corroborated usually give rise to a 'reasonable inference of imminent danger sufficient to justify taking children into temporary custody' if they might again be [abused] during the time it would take to get a warrant."  *Id.* at 1294–95.

The Court must determine whether Defendants (specifically Defendant Beck)[5] had sufficient evidence of "imminent danger of serious bodily injury" to justify H.G.'s warrantless removal.  Given that Defendants Beck and Ms. DiPaulo (1) knew about Plaintiffs' extensive history of neglect, (2) knew about Kaiser staffs' repeated concerns that Plaintiffs could not care for H.G., and (3) were in the process of obtaining a warrant to remove H.G., but lacked sufficient time to obtain the warrant, there is no question that exigent circumstances justifying removal existed.

First, removal is only appropriate where officials have reasonable cause to believe that a child will suffer serious bodily injury "*in the time that would be required to obtain a warrant*.  *Id.* at 1295 (emphasis added).  Defendant Beck and others were pursuing a warrant *for that reason*—they believed that H.G. would be in serious imminent harm upon leaving the hospital with Plaintiffs.  *Rogers* provides a cogent example: there, the risk of harm to the children was "flat."  The dirty, maggot-infested home, and malnourishment at issue were long-standing and known issues.  Because the issues, while serious, were unlikely to cause any "significant worsening of the children's physical conditions or an increase in the prospects of long-term harm,"

---

[5] Plaintiffs include Defendant Shaheed in this claim, but there are no allegations connecting Shaheed to H.G.'s removal.

1    in the time it would have taken to obtain a warrant, the Ninth Circuit held that the plaintiffs had

2    sufficient grounds to support their Fourteenth Amendment claims.  *Id.*

3        Plaintiffs thus are incorrect that *Rogers* held that "[b]ottle rot, malnourishment, and

4    disorderly home conditions do not present an imminent risk of serious bodily harm."  *See* P

5    MSJ/Opp. at 14–15.  The *Rogers* court analyzed these risks in context—of special importance to

6    the decision was the fact that officials had previously left the children in the home *with these*

7    *conditions* for an extended period.  Thus, it was not that exigency was not warranted based on the

8    conditions in the home.  It was that the officials' prior behavior showed that the conditions did not

9    present a serious risk of harm such that the children could be removed without a warrant,

10   especially because it would only take a "few hours" to obtain a warrant.  *Id.* at 1294–95.  This

11   aligns with the standard stated above: when analyzing exigency, courts must look to the officials'

12   behavior to see if the officials had reasonable cause, at the time of the removal, to believe that the

13   child was in imminent danger of serious bodily injury.  If an official has previously allowed a

14   child to stay in a condition, that same condition likely cannot constitute exigency.

15       Based on the record in *Rogers*, it was clear that officials had time to obtain a warrant.

16   From this, Plaintiffs argue that an official should get a warrant if time permits.  This is not in

17   dispute.  The dispute at hand is whether time *did not* permit officials to obtain a warrant.

18       Unlike *Rogers*, the risk that Plaintiffs posed to H.G. was not stagnant.  The Parties agree

19   that H.G. was not in any immediate danger while *in* the hospital.  The hospital staff could, and did,

20   intervene before H.G. was placed in any serious jeopardy.  But, once the hospital called

21   Defendants and announced that Plaintiffs and H.G. were to be released "momentarily," exigency

22   arose.  As confirmed by the Kaiser staff, Plaintiffs failure to (1) swaddle H.G., (2) hold H.G.

23   properly, (3) clean up after waste, and (4) respond to H.G.'s cries and need for changing, put H.G.

24   at serious risk.  *See* DKt. 54-5 at 4473 ("Nurse [] expressed strong concerns that should this infant

25   be discharged to the parents, it [] is likely that serious harm or injury will occur to the child.").

26   Hence, the moment Defendants learned that H.G. was to be taken from the hospital, the risk of

27

28   Case No.: 5:18-cv-04191-EJD
     ORDER GRANTING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT;
     DENYING PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT

United States District Court
Northern District of California

1    harm elevated and justified warrantless removal.  This is exactly the type of exigent circumstance

2    discussed in *Rogers*.  *Cf. Kirkpatrick v. Cty. of Washoe*, 843 F.3d 1184, 1192–1201 (9th Cir. 2016)

3    (finding that no exigency existed that justified warrantless removal because there was no

4    expectation that the baby would imminently be leaving the hospital).

5         Plaintiffs maintain that there was "ample time for the Defendants to secure a warrant."  P

6    MSJ/Opp. at 16.  Of course, Plaintiffs do not say *when* this time existed.  They merely concluded,

7    "Defendants did not secure a warrant despite the fact that the courts were open between the time

8    that the staff meeting took place and the time H.G. was removed."  *Id.*  This ignores the fact that

9    (1) Defendant was *in the process* of obtaining a warrant, but (2) was unable to do so because they

10   were told H.G. would be imminently released.  It is possible that a jury could find through cross-

11   examination that the circumstances were not as grave as the Kaiser nurses claimed.  Factual issues

12   thus remain.  But, Plaintiffs have not shown that exigency did not exist and so the Court **DENIES**

13   Plaintiffs' motion for partial summary judgment

14        Defendants next contend that they are entitled to qualified immunity for their decision to

15   remove H.G. without a warrant.  *See* D MSJ at 24.  A claim of qualified immunity requires a two-

16   part inquiry: "(1) Was the law governing the official's conduct clearly established? (2) Under that

17   law, could a reasonable [official] have believed the conduct was lawful?"  *Rogers*, 487 F.3d at

18   1296–97.  It is undisputed that, at the time the events took place, the Fourteenth Amendment

19   prohibited government officials from removing a child from his or her parents absent evidence of

20   "imminent danger of serious bodily injury," and that the right was well-established.  *See id.* at

21   1294–97.

22        A reasonable officer would not have understood that the law required a warrant under the

23   circumstances presented by the record.  The investigation was in its infancy; Defendants had just

24   learned about Plaintiffs' alleged neglect of H.G.  Indeed, H.G. was only days old.  Moreover,

25   Defendants were scrambling to secure a warrant before H.G. was released.  *Cf. Anderson-*

26   *Francois*, 2009 WL 1458240, at *7 (finding that a reasonable officer under the circumstances

27

28   ORDER GRANTING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT;
     DENYING PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT
     15

United States District Court
Northern District of California

1    would have understood that a warrant was required because the investigation had taken nearly six

2    weeks and the allegations of abuse had been known for months prior to the warrantless removal).

3    Also, there were specific evidence indicating that H.G. was in imminent danger—(1) Tim had

4    picked H.G. up *by her neck and allowed her body to dangle*; (2) Plaintiffs, on multiple occasions,

5    left H.G. unswaddled to the point where her body temperature dropped; and (3) Plaintiffs dropped

6    dirty diapers, post-natal pads, and other trash on the floor, rather than in trash receptacles.  More

7    concerning, Plaintiffs were unreceptive to coaching attempts by nurses and social workers.  All

8    this, coupled with the fact that Plaintiffs had an ongoing juvenile dependency action involving

9    I.G., confirms that there was a plethora of specific evidence showing that H.G. was in imminent

10   danger of serious harm.  The evidence goes beyond "the mere possibility that, because plaintiff []

11   had abused her children in the past, she might do so again."  *Id.*  Further, because the hospital told

12   Defendants that H.G. was to be released *momentarily*, Defendants did not have the few hours

13   needed to obtain a warrant.

14        Despite the above background, Plaintiffs argue that exigency did not exist.  The Court's

15   recitation of the record shows the contrary.  Accordingly, because Defendants had reasonable

16   cause to believe that H.G. was in imminent danger of serious bodily injury, they were justified in

17   removing H.G. without a warrant and are entitled to immunity for any liability following

18   therefrom.  For these reasons, Defendants motion for summary judgment is **GRANTED** as to

19   Counts Five, Six, and Seven.

20                    **C.  *Monell* Claim (3, 8, 14)**

21        Plaintiffs also sue Santa Clara County.  *See* FAC, Counts Three, Eight, and Fourteen.  A

22   public entity is subject to liability under Section 1983 only when a violation of a federally

23   protected right can be attributed to (1) an express municipal policy, such as an ordinance,

24   regulation or policy statement, see *Monell v. Department of Social Services of City of New York*,

25   436 U.S. 658 (1978); (2) a "widespread practice that, although not authorized by written law or

26   express municipal policy, is 'so permanent and well settled as to constitute a custom or usage'

27

28   Case No.: 5:18-cv-04191-EJD
     ORDER GRANTING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT;
     DENYING PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT
                                            16

United States District Court
Northern District of California

United States District Court
Northern District of California

1   with the force of law," see *City of St. Louis v. Praprotnik*, 485 U.S. 112, 127 (1988)); (3) the

2   decision of a person with "final policymaking authority," see *id.* at 123; or (4) inadequate training

3   that is deliberately indifferent to an individual's constitutional rights, see *City of Canton v. Harris*,

4   489 U.S. 378 (1989).  Plaintiffs must show a sufficient causal connection between the enforcement

5   of the municipal policy or practice and the violation of their federally protected right.  *Harris*, 489

6   U.S. at 389; *Connick v. Thompson*, 563 U.S. 51, 60 (2011).

7       The Court may not assess the *Monell* claim as to I.G.  Plaintiffs argue that the County

8   should have reprimanded Defendant Burns for using false information in her warrant declaration.

9   *See* Cormier Decl., Exs. A & B, Interrogatory Response Nos. 6–10.  The juvenile court found

10  Defendant Burns' statements to be true.  *See supra* III.A.  The Court cannot assess the *Monell*

11  claim as it relates to I.G.—doing so would require the Court to disrupt the trial court's findings.

12  This the Court cannot do.  For that reason, Defendants motion for summary judgment is

13  **GRANTED** as to Count Three.

14      As for the warrantless removal of H.G., Plaintiffs assert that the County had a "custom of

15  detaining or removing children from their family and homes without exigent circumstances."

16  They argue that the DFCS's policies were insufficient because they did not meet the Ninth

17  Circuit's standard.  *See* Cormier Decl., Exs. A & B, Interrogatory Response Nos. 6–10.  This is

18  bizarre.  The DFCS Online Policies and Procedures advise that a warrant is only appropriate where

19  there is "immediate danger of serious physical harm."  *See* D MSJ at 25.  In fact, the policies

20  advise that when there is only "imminent" danger, a warrant should be sought.  These policies thus

21  comport and *exceed* the Ninth Circuit standard.  *See Rogers*, 487 F.3d at 1294 (stating that

22  officials must have "reasonable cause to believe that the child is in *imminent* danger of serious

23  bodily injury" to justify a warrantless removal (emphasis added)).

24      The problem is compounded by Plaintiffs failure to show evidence of a custom of

25  detaining or removing children from their families without exigent circumstances.  Plaintiffs have

26  not provided evidence of a "widespread" practice of wrongfully depriving parents of their children

27

1   or sufficient facts to support their allegation that the County had a practice of depriving parents of

2   their children, had a practice of lying in warrant applications, and failed to adequately

3   train/supervise its employees.  *See Johnson v. City of Vallejo*, 99 F. Supp. 3d 1212, 1218 (E.D.

4   Cal. 2015) ("Liability for improper custom may not be predicated on isolated or sporadic

5   incidents; it must be founded upon practices of sufficient duration, frequency and consistency that

6   the conduct has become a traditional method of carrying out policy." (quotation marks and citation

7   omitted)); *see also Connick v. Thompson*, 563 U.S. 51, 61 (2011) ("A municipality's culpability

8   for a deprivation of rights is at its most tenuous where a claim turns on a failure to train.").

9   Plaintiffs only cite to the removal of H.G. to support their *Monell* claim.  This is insufficient as a

10   matter of law.  *See Okla. City v. Tuttle*, 471 U.S. 808, 814 (1985) (finding that proof of a single

11   incident of unconstitutional activity is not sufficient to impose liability under *Monell*, unless proof

12   of the incident includes proof that it was caused by an existing, unconstitutional municipal policy).

13   Accordingly, the Court **GRANTS** Defendants' motion for summary judgment as to Counts Eight

14   and Fourteen.

15              **D.  Supplemental Jurisdiction over Remaining State Law Claims**

16        The Court must now decide what to do with Plaintiffs' state claims.  *See* FAC, Counts

17   Four, Nine, Ten–Twelve, & Fifteen.  The Court can only retain jurisdiction over these claims if it

18   exercises supplemental jurisdiction over them.  *See* 28 U.S.C. § 1367(a); *see also* FAC ¶ 10.

19   Supplemental jurisdiction is discretionary.  *See Acri v. Varian Assocs., Inc.*, 114 F.3d 999, 1001

20   (9th Cir. 1997), *supplemented by* 121 F.3d 714 (9th Cir. 1997).

21        Courts "may"—and often do—"decline to exercise supplemental jurisdiction" if, as here, it

22   has "dismissed all claims over which it has original jurisdiction."  28 U.S.C. § 1367(c)(3); *see*

23   *also, e.g., Oliver v. Ralphs Grocery Co.*, 654 F.3d 903, 911 (9th Cir. 2011); *Yates v. Delano*

24   *Partners, LLC*, 2012 WL 4944269, at *2 (N.D. Cal. Oct. 17, 2012); *R.K. v. Hayward Unified Sch.*

25   *Dist.*, 2008 WL 1847221, at *2 (N.D. Cal. Apr. 23, 2008).  As the Supreme Court and Ninth

26   Circuit have "often repeated," "in the usual case in which all federal-law claims are eliminated

27

28

1    before trial, the balance of factors will point toward declining to exercise jurisdiction over the

2    remaining state-law claims." *Acri*, 114 F.3d at 1001 (alterations omitted) (quoting *Carnegie-*

3    *Mellon University v. Cohill*, 484 U.S. 343, 350 n.7 (1988)).

4         This is the usual case. First, the Court has not considered the merits of Plaintiffs' state-law

5    claims, and so there is no judicial economy interest in retaining the case. Second, Plaintiffs have

6    not articulated any significant inconvenience that they would face in refiling in state court.

7    Indeed, the Parties have already engaged in discovery, so the issues should be clearer in the event

8    Plaintiffs choose to refile their claims in state court. The Court thus declines to exercise

9    supplemental jurisdiction over Plaintiffs' state claims.

10   **IV.    CONCLUSION**

11        For the foregoing reasons, Defendants' motion for summary judgment is **GRANTED in**

12   **part** as to Plaintiffs' federal claims (Counts One–Three, Five–Eight, & Thirteen–Fourteen).

13   Plaintiffs' motion for partial summary judgment is **DENIED.** The Court declines to exercise

14   supplemental jurisdiction over Plaintiffs' state-law claims. The Clerk shall close the file and a

15   judgment in favor of Defendants shall follow.

16        **IT IS SO ORDERED.**

17   Dated: August 17, 2020

18                                                _____
                                                 EDWARD J. DAVILA
19                                               United States District Judge

20

21

22

23

24

25

26

27

28
     Case No.: 5:18-cv-04191-EJD
     ORDER GRANTING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT;
     DENYING PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT
                                       19